```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

IN RE ROTAVIRUS VACCINES    :   CIVIL ACTION
ANTITRUST LITIGATION        :
                            :   NO. 18-CV-1734 (Consolidated)


## MEMORANDUM AND ORDER


**JOYNER, J.**                                **January 22, 2019**

This consolidated putative antitrust class action has been brought before the Court on Motion of Defendant Merck Sharp & Dohme Corp. ("Merck") to compel each individual plaintiff to arbitration and to stay these proceedings pending such arbitrations. For the reasons which we explain in the pages which follow, the motion shall be denied.

## Factual Background

As averred in the Consolidated Amended Class Action Complaint filed by Sugartown Pediatrics, LLC and Schwartz Pediatrics S.C.,[1] this lawsuit "challenges Merck's anticompetitive vaccine bundling scheme whereby Merck leverages its monopoly power in multiple pediatric vaccine markets to maintain its monopoly power in the Rotavirus Vaccine Market and,

---

[1] In an Order entered on August 8, 2018, the action initiated by Margiotti & Kroll Pediatrics, P.C. against Merck (Case No. 18-CV-3064) was consolidated into this action as well.

consequently, to charge supracompetitive prices to purchasers of its rotavirus vaccines." (Consol. Am. Compl., ¶2). In essence, Plaintiffs allege that as to its RotaTeq Rotavirus vaccine, instead of lowering the price which it was charging when it held 100% of the Rotavirus market, Merck responded to the entry of GlaxoSmithKline's competing vaccine, Rotarix, by adding an "exclusionary RotaTeq Bundled Loyalty Condition to its [buying] contracts, thereby bundling RotaTeq with its other pediatric vaccines." (Consol. Am. Compl., ¶s112, 114-115). In so doing, Plaintiffs aver that Merck penalized any of its customers who would buy Rotarix from GSK by forcing them to pay substantially higher prices for all of the vaccines in the Merck Bundle, including those for which Merck is the sole seller. (Consol. Am. Compl., ¶116). Plaintiffs allege that they suffered anti-trust injury because they, like most physicians, practices and hospitals, purchase the vaccines which they administer to their patients through Physician Buying Groups ("PBGs") and Merck has effectively co-opted the PBGs to impose and enforce its anticompetitive and exclusionary conduct with the result that they and the proposed class members have repeatedly paid artificially inflated prices for rotavirus vaccines since Rotarix entered the market and continuing through the present. (Consol. Am. Compl., ¶s 117-120, 145-149).

By the motion that is now before us, Merck seeks to stay this matter and compel Plaintiffs to submit its claims to arbitration on the basis of arbitration clauses contained within Merck's contracts with the three Physician Buying Groups through which Plaintiffs purchased their vaccines. Those clauses are virtually identical in all three of the contracts at issue and read as follows:

> Any controversy, claim or dispute arising out of or relating to the performance, construction, interpretation or enforcement of this Agreement shall, if not resolved through negotiations between the parties, be submitted to mandatory binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. Sec. 1 et. seq.

Plaintiffs rejoin that this matter should *not* be submitted to arbitration because they were not signatories to any agreements directly with Merck and the agreements which *they* entered into with the Physician Buying Groups of which they were members did *not* contain any such clauses requiring submission of any of their disputes to arbitration.

## Discussion

*A. Arbitration under the Federal Arbitration Act*

As the Supreme Court has observed, "Congress adopted the [Federal] Arbitration Act in 1925 in response to a perception that courts were unduly hostile to arbitration" and, in so doing, "directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and

3

enforceable.'" Epic Systems Corp. v. Lewis, 138 S. Ct. 1612, 1621, 200 L. Ed.2d 889 (2018) (quoting 9 U.S.C. §2); CompuCredit Corp. v. Greenwood, 565 U.S. 95, 97, 132 S. Ct. 665, 669, 181 L. Ed.2d 586 (2012). The Act, codified at 9 U.S.C. §1, *et. seq.*, thereby "establishes a 'liberal federal policy favoring arbitration agreements.'" Id, (quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed.2d 765 (1983).

The Federal Arbitration Act also provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration [9 U.S.C. §3], and an affirmative order to engage in arbitration [§4]. Moses H. Cone, 460 U.S. at 23, 103 S. Ct. at 940. Fundamentally, however, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S. Ct. 1415, 1418, 89 L. Ed.2d 648 (1986) (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 1353, 4 L. Ed.2d 1409 (1960)). Indeed, while "[t]he Federal Arbitration Act (the "FAA"), enables the enforcement of a contract to arbitrate," [it] "requires that a court shall be 'satisfied that the making of the agreement for arbitration is not in issue' before it orders

arbitration." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 771 (3d Cir. 2013) (quoting 9 U.S.C. §4). In other words, "'before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect.'" Id, at 773 (quoting Park-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 (3d Cir. 1980)). Then, if there exists a valid agreement to arbitrate and the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement, the claim should be submitted to arbitration. Trippe Manufacturing Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005); Sanum Investment Limited v. San Marco Capital Partners, LLC, 263 F. Supp. 3d 491, 495 (D. Del. 2017); Miron v. BDO Seidman, LLP, 342 F. Supp. 2d 324, 328 (E.D. Pa. 2004).

*B. Standards Governing Motions to Compel Arbitration*

In evaluating "whether there is a valid agreement to arbitrate, a district court 'must initially decide whether the determination is made under Fed. R. Civ. P. 12(b)(6) or 56.'" Noye v. Johnson & Johnson, 310 F. Supp. 3d 470, 473 (M.D. Pa. 2018) (quoting Sanford v. Bracewell & Guiliani, LLP, 618 Fed. Appx. 114, 2015 WL 4035614 at *2 (3d Cir. 2015)). "[W]hen it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to

5

compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" Guidotti, 716 F.3d at 776 (quoting Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F. Supp. 2d 474, 479 (E.D. Pa. 2011)). "But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question.' After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard." Id. Under this standard of course, the court must consider all evidence presented by the party opposing arbitration and construe all reasonable inferences in that party's favor and find that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Bey v. Citi Health Card, Civ. A. No. 15-6533, 2017 U.S. Dist. LEXIS 103812 at *5 (E.D. Pa. July 6, 2017); Ostroff v. Alterra Healthcare Corp., 433 F. Supp. 2d 538, 541 (E.D. Pa. 2006).

In this case, both parties have submitted evidentiary support for their respective positions in the form of witness affidavits/declarations, contracts, etc. We therefore find that

6

the summary judgment standard is properly utilized in ruling upon Defendant's motion to compel arbitration.

    C. *Application to Non-Signatories*

It is axiomatic that, "[u]nder Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (citing Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002)).[2] Here, as Plaintiffs point out and as the exhibits attached to the instant motion and responses and reply and sur-reply briefs in support and opposition thereto clearly demonstrate, Plaintiffs were never parties to nor signatories to the Agreements containing the arbitration clauses which were entered into between Merck and the PBGs. Plaintiffs therefore never expressly agreed to arbitration.

Although the usual presumption in favor of arbitration does not extend to non-signatories to an agreement, but rather applies only when both parties have consented to and are bound by the arbitration clause, "[s]till, a non-signatory may be bound by an arbitration agreement if 'traditional principles' of

---

[2] As per ¶9.11 in Merck's agreements with the PBGs: "This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania without giving effect to Pennsylvania's choice of laws or arbitration provisions."

7

state law allow a contract to be enforced by or against nonparties to the contract.". Griswold v. Coventry First LLC 762 F.3d 264, 271 (3d Cir. 2014) (citing, *inter alia,* Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009)); White v. Sunoco, Inc., 189 F. Supp. 3d 486, 491 (E.D. Pa. 2016). In other words, "[b]ecause arbitration is a matter of contract, exceptional circumstances must apply before a court will impose a contractual agreement to arbitrate on a non-contracting party." Miron, 342 F. Supp. 2d at 332 (citing Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995) and AT & T Technologies, 475 U.S. at 650).

Specifically, there are five theories under which non-signatories may be bound to the arbitration agreements of others: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. Booth v. BMO Harris Bank, N.A., Civ. A. No. 13-5968, 2014 U.S. Dist. LEXIS 111053 at *12, 2014 WL 3952945 at *12 (E.D. Pa. Aug. 11, 2014); Miron, supra. Here, Defendant Merck appears to be arguing that, insofar as the PBGs purportedly signed the Agreements with it on behalf of themselves and their members, the PBGs were therefore acting as Plaintiffs' agents and/or that Plaintiffs were therefore the third-party beneficiaries of the

8

Agreements and should be estopped from avoiding the arbitration clauses.

*1. Agency*

Under the law of Pennsylvania, an agency relationship exists with the (1) manifestation by the principal that the agent shall act for him; (2) the acceptance of the undertaking by the agent; and (3) the control of the endeavor in the hands of the principal. Tribune Review v. Westmoreland Housing Authority, 574 Pa. 661, 833 A.2d 112, 119-120 (2003); Casey v. GAF Corp., 2003 PA Super 222, 828 A.2d 362, 367 (Pa. Super. Ct. 2003); CardioNet, LLC v. Mednet Healthcare Technologies, Inc., 146 F. Supp. 3d 671, 691 (E.D. Pa. 2015). The burden of establishing an agency relationship rests with the party asserting the relationship and such a relationship will only result if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary. Basile v. H & R Block, Inc., 563 Pa. 359, 761 A.2d 1115, 1120 (2000). "Implicit in this relationship is the consent by the principal that one may act on his or her behalf and is subject to his or her control." Darlington v. County of Chester, 147 Pa. Cmwlth. 177, 188, 607 A.2d 315, 320 (Pa. Cmwlth. Ct. 1992), *app. denied,* 531 Pa. 657, 613 A.2d 562 (1992). It should be noted that "an agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent

authority, and/or (4) authority by estoppel." Washburn v. Northern Health Facilities, Inc., 121 A.3d 1008, 1012 (Pa. Super. Ct. 2015) (quoting Walton v. Johnson, 2013 PA Super 108, 66 A.3d 782, 786 (Pa. Super. Ct. 2013). It has been said that:

> Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters. Implied authority exists in situations where the agent's actions are "proper, usual and necessary" to carry out express agency. Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal.

Id, (quoting Id.). "Courts have also applied agency principles to permit a non-signatory to enforce a contract where there is either a parent/subsidiary, ownership, or some other significant relationship between the signatory and the non-signatory defendant." White, 189 F. Supp. 3d at 494.

In this case, Merck premises its claim of agency on paragraphs 2.1 and 4.6 in its agreements with the PBGs which read:

> 2.1 Upon execution of this Agreement, [PBG] shall submit to Merck a complete list of all [PBG] members. All [PBG] members that purchase vaccines ("Vaccine Clinics") through an agreement entered into, maintained or facilitated by [PBG] shall, subject to acceptance by Merck, be listed in Schedule B and eligible to purchase Merck Vaccines pursuant to this Agreement (collectively, the "Eligible Clinics"), unless and until removed from Schedule B as set forth

herein.  Any Vaccine Clinic not accepted by Merck shall not be an Eligible Clinic and shall not be eligible to purchase Merck Vaccines pursuant to this Agreement.  By submitting a list of Vaccine Clinics to be attached to Schedule B, [PBG] hereby acknowledges that it has the authority of the Vaccine Clinics to participate in this Agreement.

4.6     [PBG] will accurately communicate to Eligible Clinics the terms and conditions of this Agreement identified as being applicable to the Eligible Clinics and shall inform them that by purchasing Merck Vaccines pursuant to this Agreement, Eligible Clinics agree to the applicable terms and conditions set forth herein.

Although these clauses obviously reflect Merck's desire to impose the terms and conditions of its buying agreements with the PBGs on the individual medical practices/"vaccine clinics" with whom the PBGs have relationships, in and of themselves, however, they do not evince an agency relationship between Plaintiffs and the PBGs.  Likewise, they do not demonstrate that the Plaintiffs either consented or had knowledge that, by becoming PBG members, they were giving authority to the PBGs to enter into an agreement with Merck to arbitrate.[3]

---

[3]  Nor do we find that such authority was conferred by Plaintiffs through the contracts which they made with the PBGs.  To be sure, the Main Street Vaccines Agreement states in relevant part only that:

> The following is an agreement between (Practice Group) representing all providers of _____ with a practice address of _____ and Main Street Vaccines (Main Street) to participate as a member practice (member) in a vaccine purchasing contract with Merck Vaccines  …

The CCPA Agreement, on the other hand, provides in pertinent part:

Furthermore, there is no other evidence to suggest that either a parent-subsidiary, ownership, or any other significant relationship existed between the signatory and the non-signatory parties, nor is there any other evidence that Plaintiffs (acting as principals) said or did anything which might have caused Defendant to believe that they had granted the PBGs the authority to act broadly on their behalves. (See, e.g., Declarations of Dr. Gerald Margiotti, M.D., Dr. David Schwartz and Louis M. Gianciulio, M.D. attached to Plaintiffs' Sur-Reply Memorandum in Further Opposition to Defendant's Motion to Compel Individual Arbitration

---

By executing and submitting this Agreement to GPO [CCPA Purchasing Partners, L.L.C.], Provider [the health care provider executing the agreement] authorizes GPO to act as its non-exclusive agent to arrange for the purchase of goods and services as set forth herein, and agrees to comply with and be bound by the terms and conditions of this Agreement."

While the CCPA contract does on its face grant CCPA "non-exclusive" authority to arrange for the purchase of "goods and services as set forth herein," unlike the Main Street Vaccines agreement, the CCPA Agreement does not specify Merck as a Vendor and is instead a broad, general agreement with its member practices to negotiate and enter into vendor agreements with any number of sellers of medical supplies, pharmaceuticals and other goods and services. Neither the CCPA nor the Main Street Vaccines contract contains any references whatsoever to arbitration nor does either incorporate any other agreements by reference. And, the CCPA agreement also contains an integration clause representing that "[t]his Agreement contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement and shall supersede any and all prior oral or written negotiations, agreements, or understanding between the parties with respect thereto."

and Stay Proceedings). Given that the burden of proving agency rests upon the party seeking to assert it, without more, we cannot find that Defendant here has established as a matter of law that the PBGs were the agents of the plaintiffs.

*Third Party Beneficiary/Estoppel*

"There are two theories of equitable estoppel that can bind a non-signatory to an arbitration clause." Booth, 2014 U.S. Dist. LEXIS at *16 - *17 (citing E.I. Dupont De Nemours & Co. v. Thone Poulenec Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 199 (3d Cir. 2001)). "First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." Dupont, supra. Stated otherwise, when a non-signatory has reaped the benefits of a contract containing an arbitration clause, they can be estopped from avoiding arbitration. See, Invista S.A.R.L. v. Rhodia, S.A., 625 F.3d 75, 85 (3d Cir. 2010). "This prevents a non-signatory from 'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by." Id.

The second, alternative theory of estoppel arises where there is an "obvious and close nexus" between the non-signatories and the contract or the contracting parties. Miron,

342 F. Supp.2d at 333. "Determining whether a close relationship exists between the entities involved requires 'examining the relationship of the alleged wrong to the nonsignatory's obligations and duties in the contract." Booth, 2014 U.S. Dist. LEXIS at *17 (quoting Miron, 342 F. Supp. 2d at 333). "[T]o satisfy the second part of the test, the non-signatory seeking enforcement of an arbitration agreement must show that the claims against them are intimately founded in and intertwined with the underlying obligations of the contract to which they were not a party." Noye, 310 F. Supp. 3d at 476 (quoting Dupont, 269 F.3d at 199 and Devon Robotics v. DeViedma, No. 09-cv-3552, 2009 U.S. Dist. LEXIS 112077, 2009 WL 4362822 at *4 (E.D. Pa. Nov. 30, 2009)). By way of example, "[a] signatory plaintiff's claims against a non-signatory defendant are intertwined with an agreement containing an arbitration clause when the claims 'rely on the terms of the agreement or assume the existence of, arise out of, or relate directly to, the written agreement.'" Sanum, 263 F. Supp. 3d at 495 (quoting, *inter alia,* Booth, supra, and A.G.K. Sarl v. A.M. Todd Co., 2008 U.S. Dist. LEXIS 21266, 2008 WL 724607 at *9 (E.D. Pa. Mar. 18, 2008)). The Third Circuit has "noted that arbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with, those of a signatory." Pritzker v. Merrill, Lynch, Pierce,

14

Fenner & Smith, 7 F.3d 1110, 1122 (3d Cir. 1993) (citing Isidor Paiewonsky Associates, Inc. v. Sharp Properties, Inc., 998 F.2d 145,155 (3d Cir. 1993).

In application of the foregoing and drawing all reasonable inferences in favor of the plaintiffs as the non-movants, we again cannot find that the requisite showing of relatedness or congruence has been made. Although Plaintiffs are PBG members, there is no evidence that they are closely related in terms of their ownership, administration, mission, business functions or otherwise. Plaintiffs are private medical practices presumably independently owned and operated by either larger, medical practice groups or some or all of the individual physicians who practice with them. There is absolutely no evidence on this record that they have any relationship whatsoever with Merck or with the PBG(s) to which they belong aside from having entered into contractual agreements for membership in the PBGs. The Plaintiffs' only obligations and duties under the Merck contracts are those found in paragraphs 9.3 and 9.5 (Duty to Warn and Confidentiality), 9.8 (regarding reporting of discounts pursuant to 42 C.F.R. §1001.952(h) and use of reconciliation statements and invoices provided by Merck to so report) and 9.16 (concerning disclosure of private, protected individual health information). Accordingly, we cannot find that the claims at issue are "intimately founded in and intertwined with the

15

underlying obligations of the contract(s) to which Plaintiffs were not a party.

## **Conclusion**

Based upon all of the foregoing, the Court simply cannot find that sufficient grounds exist to compel the Plaintiffs to arbitrate their anti-trust claims in this case. The Defendant's Motion to Compel Arbitration and Stay Proceedings shall therefore be denied pursuant to the attached Order.