**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


IN RE ROTAVIRUS VACCINES  : CIVIL ACTION
ANTITRUST LITIGATION       :
                           : NO. 18-CV-1734 (Consolidated)


**MEMORANDUM AND ORDER**


JOYNER, J.                        November   20  , 2020


This consolidated putative antitrust class action is once
again before this Court on the renewed Motion of Defendant Merck
Sharp & Dohme Corp. ("Merck") to compel each individual
plaintiff to arbitration and to stay these proceedings pending
those arbitrations and Plaintiffs' counter Motion for Summary
Judgment as to Arbitrability.  For the reasons which we explain
in the pages which follow, Defendant's Motion shall be denied
and Plaintiffs' motion will be granted.

**Factual Background**

The instant motion has been returned to us from the Third
Circuit following Merck's appeal from our January 23, 2019
Memorandum and Order denying its request to compel this matter
to be arbitrated on the grounds that we improperly applied the
summary judgment standard in evaluating the relevant contracts
and membership agreements and erred in finding that Merck had

1

failed to meet its burden of showing an agency relationship.  In reversing and remanding this matter, the Third Circuit determined that application of the summary judgment standard to this motion was premature and held that limited discovery on the issue of arbitrability was appropriate.  That discovery has since concluded and we now consider Defendant's motion to compel arbitration for the second time together with Plaintiffs' motion for summary judgment as to arbitrability.

We begin by repeating our recitation of the salient facts as they have been alleged in the Consolidated Amended Class Action Complaint filed by Sugartown Pediatrics, LLC and Schwartz Pediatrics S.C.[1]  In substance, Plaintiffs "challenge[] Merck's anticompetitive vaccine bundling scheme whereby Merck leverages its monopoly power in multiple pediatric vaccine markets to maintain its monopoly power in the Rotavirus Vaccine Market and, consequently, to charge supracompetitive prices to purchasers of its rotavirus vaccines."  (Consol. Am. Compl., ¶2).  The essence of these averments is that as to its RotaTeq Rotavirus vaccine, instead of lowering the price which it was charging when it held 100% of the Rotavirus market, Merck responded to the entry of GlaxoSmithKline's competing vaccine, Rotarix, by adding an

---

[1] In an Order entered on August 8, 2018, the action initiated by Margiotti & Kroll Pediatrics, P.C. against Merck (Case No. 18-CV-3064) was consolidated into this action as well.

"exclusionary RotaTeq Bundled Loyalty Condition to its [buying] contracts, thereby bundling RotaTeq with its other pediatric vaccines." (Consol. Am. Compl., ¶s112, 114-115). According to Plaintiffs, in so doing, Merck penalized any of its customers who would buy Rotarix from GSK by forcing them to pay substantially higher prices for all of the vaccines in the Merck Bundle, including those for which Merck is the sole seller. (Consol. Am. Compl., ¶116).  Plaintiffs contend that they suffered anti-trust injury because although they, like most physicians, practices and hospitals, purchase the vaccines which they administer to their patients directly from Merck, the prices which they pay for those vaccines are discounted as a consequence of their memberships in Physician Buying Groups ("PBGs").  Plaintiffs' complaint avers that Merck has effectively co-opted the PBGs to impose and enforce its anticompetitive and exclusionary conduct with the result that they and the proposed class members have repeatedly paid artificially inflated prices for rotavirus vaccines since Rotarix entered the market and continuing through the present. (Consol. Am. Compl., ¶s 117-120, 145-149).

By the renewed motion that is now before us, Merck repeats its request to stay this matter and compel Plaintiffs to submit its claims to arbitration on the basis of arbitration clauses contained within Merck's contracts with the Physician Buying

Groups through which Plaintiffs purchased their vaccines.[2]

Those clauses are virtually identical in all of the contracts at

issue, are found at Section 9.10 of the contracts and read as

follows:

> Any controversy, claim or dispute arising out of or
> relating to the performance, construction, interpretation
> or enforcement of this Agreement shall, if not resolved
> through negotiations between the parties, be submitted to
> mandatory binding arbitration pursuant to the Federal
> Arbitration Act, 9 U.S.C. Sec. 1, et. seq.

In response to the renewed motion to compel, Plaintiffs

reiterate that this matter should not be submitted to arbitration

because *they* were not signatories to any agreements directly with

Merck and the separate membership agreements which they entered

into with the Physician Buying Groups did not contain any such

clauses requiring submission of any of their disputes to

arbitration.  Because discovery on the matter of arbitrability has

now closed and, according to Plaintiffs, the record on this issue

clearly demonstrates that they are entitled as a matter of law to

---

[2] Plaintiffs Margiotti & Kroll and Sugartown Pediatrics are members of the
Main Street Vaccines Physician's Buying Group (PBG) and Plaintiff Schwartz
Pediatrics is a member of the Children's Community Physicians Association,
LLP ("CCPAPP") buying group.  A Physician's Buying Group, otherwise known as a
Group Purchasing Organization ("GPO") or a Physician's Organization ("PO"),
essentially has as its primary intent or purpose the servicing and sales of
injectable products such as vaccines and pharmaceutical products to
independent physician practices that they stock in their office; primarily
these products are injectables but it is not uncommon for such groups to
include provisions for other distribution agreements for such things as
office supplies, billing services, etc. (Exhibit 74 to Plaintiff's Motion for
Summary Judgment [Deposition of Michele Taylor] at pp. 36-37).  Under Merck's
agreements, the PBGs don't buy the vaccines and resell them to their
healthcare provider members. Rather, PBG healthcare provider members purchase
the vaccines directly from Merck or sometimes from distributors such as
VaxServ, for use in their practices.  (Id, at p. 37).

4

the entry of judgment in their favor decreeing that this matter should proceed to be adjudicated on the merits in this court, Plaintiffs also seek the entry of an order granting their motion.

## Principles Applicable to Motions to Compel Arbitration and Summary Judgment Motions

Under Fed. R. Civ. P. 56(a), any party may move for summary judgment on any claim or defense or any part of a claim or defense and judgment is appropriately entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, to be deemed "genuine" or "material," "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment…" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). Thus, "[f]actual disputes that are irrelevant or unnecessary will not be counted." Id. Stated otherwise, "[a] genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" In re Tribune Media Co., 902 F.3d 384, 392 (3d Cir. 2018) (quoting Anderson, supra.); Stone v. Troy Construction, LLC, 935 F.3d 141 (3d Cir. 2019).

A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." Salazar-Limon v. City of Houston, 137 S. Ct. 1277, 1280 (2017) (quoting Anderson, 477 U.S. at 249). "In so doing, the court must 'view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion.'" Id, (quoting Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed.2d 686 (2007) and United States v. Diebold, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed.2d 176 (1962)). Thus, in order to survive summary judgment, an opposing party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

In turn, the procedures governing motions and/or petitions to arbitrate in the federal courts are outlined in Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. Section 1, *et. seq.* Section 3 provides for a stay of proceedings where an issue is referable to arbitration and reads:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Section 4 applies when a party fails and/or refuses to arbitrate and states the following:

A party aggrieved by the alleged failure, neglect, or
refusal of another to arbitrate under a written agreement
for arbitration may petition any United States district
court which, save for such agreement, would have
jurisdiction under Title 28 in a civil action or in
admiralty of the subject matter of a suit arising out of
the controversy between the parties, for an order directing
that such arbitration proceed in the manner provided for in
such agreement. Five days' notice in writing of such
application shall be served upon the party in default.
Service thereof shall be made in the manner provided by the
Federal Rules of Civil Procedure…. The court shall hear the
parties, and, upon being satisfied that the making of the
agreement for arbitration or the failure to comply
therewith is not in issue, the court shall make an order
directing the parties to proceed to arbitration in
accordance with the terms of the agreement.  The hearing
and proceedings, under such agreement, shall be within the
district in which the petition for an order directing such
arbitration is filed.  If the making of the arbitration
agreement or the failure, neglect, or refusal to perform
the same be in issue, the court shall proceed summarily to
the trial thereof.  If no jury trial be demanded by the
party alleged to be in default, or if the matter in dispute
is within admiralty jurisdiction, the court shall hear and
determine such issue.  Where such an issue is raised, the
party alleged to be in default may, except in cases of
admiralty, on or before the return day of the notice of
application, demand a jury trial of such issue, and upon
such demand the court shall make an order referring the
issue or issues to a jury in the manner provided by the
Federal Rules of Civil Procedure, or may specially call a
jury for that purpose.  If the jury find that no agreement
in writing for arbitration was made or that there is no
default in proceeding thereunder, the proceeding shall be
dismissed.  If the jury find that an agreement for
arbitration was made in writing and that there is a default
in proceeding thereunder, the court shall make an order
summarily directing the parties to proceed with the
arbitration in accordance with the terms thereof.

## **Discussion**

Although the Federal Arbitration Act, 9 U.S.C. Section 1,

*et. seq.* embodies a "liberal federal policy in favor of

7

arbitration agreements," it has long been firmly held that arbitration is and always has been "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S. Ct. 1415, 1418, 89 L. Ed.2d 648 (1986); Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed.2d 765 (1983). See also, Preston v. Ferrer, 552 U.S. 346, 353, 128 S. Ct. 978, 984, 169 L. Ed.2d 917 (2008)(noting that "Section 2 declares a national policy favoring arbitration of claims that parties contract to settle in that manner.")

"The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute." Invista S.a.r.l. v. Rhodia, SA, 625 F.3d 75, 84 (3d Cir. 2010)(quoting Century Indemnity Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 522 (3d Cir. 2010)). Indeed, "[b]efore compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." Id. In determining whether the parties agreed to arbitrate, the courts generally "should apply ordinary state-law principles that govern the formation of contracts." First

_Options of Chicago, Inc. v. Kaplan_, 514 U.S. 938, 944, 115 S.

Ct. 1920, 131 L. Ed.2d 985 (1995).[3]

Although "[t]he presumption in favor of arbitration does

not extend … to non-signatories to an agreement" and "applies

only when both parties have consented to and are bound by the

arbitration clause," nevertheless in certain circumstances, "a

non-signatory may be bound by an arbitration agreement if

'traditional principles of state law allow a contract to be

enforced by or against nonparties to the contract.'" _Griswold_

_v. Coventry First, LLC_, 762 F.3d 264, 271 (3d Cir. 2014)(quoting

_Arthur Andersen LLP v. Carlisle_, 556 U.S. 624, 631, 129 S. Ct.

1896, 173 L. Ed.2d 832 (2009)); _E.I. Dupont de Nemours & Co. v._

---

[3] The parties here agree that the law of Pennsylvania is properly applied in this case.  _See_, _e.g._, Pl's Reply Memorandum in Support of Motion for Summary Judgment as to Arbitrability, p. 4; Defendant's Memorandum in Support of its Renewed Motion to Compel Individual Arbitration and Stay Proceedings, at p. 13, note 7).  In Pennsylvania, "an enforceable contract requires, among other things, that the terms of the bargain be set forth with sufficient clarity." _Lackner v. Glosser_, 2006 PA Super 14, 892 A.2d 21, 30-31 (citing _Biddle v. Johnsonbaugh_, 444 Pa. Super. 450, 664 A.2d 159, 163 (1995)).  In other words, "[f]or a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain." _Id_, (citing _Peck v. Delaware County Board of Prison Inspectors_, 572 Pa. 249, 260, 814 A.2d 185, 191 (2002)).  Indeed, "[i]n order to form a contract, there must be an offer, acceptance and consideration or mutual 'meeting of the minds.'" _In re Estate of Johnson_, 2009 PA Super 54, 970 A.2d 433, 439 (2009)(quoting _Yarnall v. Almy_, 703 A.2d 535, 538 (Pa. Super. 1997)).

Here, the parties are not disputing that valid, enforceable contracts exist between the PBGs and Merck or that those contracts contain broad arbitration clauses dictating that "[a]ny controversy, claim or dispute arising out of or relating to the performance, construction, interpretation or enforcement of" the agreements be arbitrated.  Instead, the threshold question is whether Plaintiffs, by virtue of their relationships with the PBGs, may be deemed to be "parties" to these agreements as well and whether the anti-trust claims which Plaintiffs are asserting here fall within the scope of those contracts.

Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 194 (3d Cir. 2001).  Generally, the common law theories used to bind a non-signatory to an arbitration clause include third party beneficiary, agency and equitable estoppel, although the Third Circuit has recognized "five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego, and (5) estoppel." Allstate Settlement Corp. v. Rapid Settlements, Ltd., 559 F.3d 164, 170 (3d Cir. 2009)(quoting Trippe Manufacturing Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005)); Bouriez v. Carnegie Mellon University, 359 F.3d 292, 295 (3d Cir. 2004); Metcalf v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 768 F. Supp. 2d 762, 773 (M.D. Pa. 2011). In this case, Merck is relying upon the agency and equitable estoppel theories to compel Plaintiffs to arbitrate and we shall therefore consider each of these theories in turn.

*A. Agency*

Generally speaking, "[a]n agent is one who acts in the place and stead of another." Commonwealth v. Britton, 229 A.3d 590, 598 (Pa. 2020).  An agency is created where there exists: "(1) manifestation by the principal that the agent shall act for him; (2) acceptance of the undertaking by the agent; and (3) the control of the endeavor in the hands of the principal." Tribune-Review Publishing Co. v. Westmoreland County Housing

Authority, 574 Pa. 661, 674, 833 A.2d 112, 119-20 (2003); Basile
v. H & R Block, Inc., 563 Pa. 359, 367, 761 A.2d 1115, 1120
(2000); Volunteer Fire Co. v. Hilltop Oil Co., 412 Pa. Super.
140, 146, 602 A.2d 1348, 1351 (1992)(quoting Scott v. Purcell,
264 Pa. Super. 354, 363, 399 A.2d 1099, 1093 (1979) and
Restatement (Second) of Agency, Section 1(1) (1958)).  Given
that "[a]n agency relationship is a fiduciary one and that the
agent is subject to a duty of loyalty to act only for the
principal's benefit, … in all matters affecting the subject of
the agency, the agent must act with the utmost good faith in
furthering and advancing the principal's interest, including a
duty to disclose to the principal all relevant information."
Basile, 563 Pa. at 368, 761 A.2d at 1120 (quoting Sutliff v.
Sutliff, 515 Pa. 393, 404, 528 A.2d 1318, 1323 (1987) and
Sylvester v. Beck, 406 Pa. 607, 610-611, 178 A.2d 755, 757
(1962)).  Although the existence of an agency relationship is a
question of fact, it requires no special formalities; agency
however, "cannot be assumed from the mere fact that one does an
act for another."  LJ Construction & Renovations Corp. v.
Bjornsen, 2020 Pa. Super. Unpub. LEXIS 523, *13, 227 A.3d 411,
2020 WL 730804 (Pa. Super. 2020); Volunteer Fire, supra,(quoting
Bross v. Varner, 159 Pa. Super. 495, 496, 48 A.2d 880, 881

(1946)).[4]  The burden of establishing an agency relationship

rests with the party asserting the relationship.  Mill Run

Associates v. Locke Property Co., Inc., 282 F. Supp. 2d 278, 289

(E.D. Pa. 2003).

Similarly, "an agent can only be bound by the agreements of

his principal when that principal acted with the agent's actual,

implied, or apparent authority."  Bouriez, 359 F.3d at 294-295

(citing Bel-Ray Co. v. Chemrite, 181 F.3d 435, 445 (3d Cir.

1999)).  Indeed, "[u]nder Pennsylvania law, there are four types

of agency: (1) express authority, or that which is directly

granted; (2) implied authority, to do all that is proper, usual

and necessary to the exercise of the authority actually granted;

(3) apparent authority, as where the principal holds one out as

agent by words or conduct; and (4) agency by estoppel."  Griffen

v. Exide Corp., Civ. A. No. 01-CV-1409, 2001 U.S. Dist. LEXIS

24164, 2001 WL 34355645 at *7 - *8 (E.D. Pa. Dec. 10, 2001)

(citing Apex Financial Corp. v. Decker, 245 Pa. Super. 439, 369

---

[4] In Basile v. H & R Block, Inc., 563 Pa. 359, 370, 761 A.2d 1115, 1121
(2000), the Pennsylvania Supreme Court explained:

> The special relationship arising from an agency agreement, with its
> concomitant heightened duty, cannot arise from any and all actions, no
> matter how trivial, arguably undertaken on another's behalf.  Rather,
> the action must be a matter of consequence or trust, such as the
> ability to actually **bind** the principal or alter the principal's legal
> relations. … [I]mplicit in the long-standing Pennsylvania requirement
> that the principal manifest an intention that the agent act on the
> principal's behalf is the notion that the agent has authority to alter
> the principal's relationships with third parties, such as binding the
> principal to a contract. … (emphasis in original).

A.2d 483, 485 (Pa. Super. 1976)).  "Apparent authority has been
defined as the power to bind a principal when the principal has
not actually granted authority to an agent but leads persons
with whom his agents deal to believe that he has granted such
authority."  Red Run Mountain, Inc. v. Earth Energy Consultants
LLC, 2017 Pa. Super. Unpub. LEXIS 1703 at *18 – *19, 170 A.3d
1193 (Pa. Super. 2017)(citing Apex, supra.)  "The test for
apparent authority is whether a person of ordinary prudence,
diligence and discretion would have the right to believe that
the agent possessed the authority he purported to exercise," and
"implied authority is the authority to do all that is proper,
usual, and necessary to the exercise of authority already
granted."  Id.  Finally, "authority by estoppel occurs when the
principal fails to take reasonable steps to disavow the third
party of their belief that the purported agent was authorized to
act on behalf of the principal."  Consolidated Rail Corp. v. ACE
Property & Casualty Insurance Co., 2018 PA Super 68, 182 A.3d
1011, 1027 (Pa. Super. 2018).

In this case, Defendant asserts that "[t]he undisputed
record establishes that agency law requires plaintiffs to
arbitrate their dispute with Merck because the PBGs acted as
agents of their members when they entered into contracts with
Merck for the purchase of pediatric vaccines that contained
arbitration clauses."  (Def's Memorandum in Support of Renewed

Motion to Compel Arbitration and Stay Proceedings, p. 2).   In making this argument, Defendant points to a variety of documents which purportedly support its position and the record in this matter reflects that there are primarily two documents at issue here: (1) the Agreements between Merck and the PBGs; (2) the membership agreements/enrollment applications submitted by the individual physician groups to the PBGs in which they wished to enroll. As noted, an arbitration clause is contained **only** in the Agreements between Merck and the PBGs.

In reading the Agreements between Merck and the two PBGs at issue here - Main Street Vaccines and CCPA Purchasing Partners[5], we first note that those contracts are nearly mirror images of one another.[6]  Under those agreements, the PBGs have the obligation to enroll (via separate membership agreements) as many physician practice groups that purchase vaccines as

---

[5] Merck designated CCPAPP as the primary Physician Organization/Physician Buying Group for Illinois and Main Street Vaccines as the primary PO/PBG for New York, Pennsylvania, New Jersey, Massachusetts and Maryland. (Pl's Exhibit 70, p. 271). CCPAPP re-organized from limited partnership status to that of an LLC in 2016. (Pl's Exhibit 69, p. 20).  MSV became an independent corporation within NDC in April, 2015.  (Pl's Exhibit 66 [Dep. of Joshua Evan Dowd], pp. 71-72; Pl's Exhibit 73 [Dep. of William Mark Smith, President of MSV], pp. 16-17).

[6] Merck utilized template contracts with all of the PBGs with which it did business such that the contracts were for the most part uniform regardless of the PBG with which Merck was contacting. Typically, the Merck-PBG contracts were for sales of a "portfolio" of vaccines, rather than just a single vaccine, and provided for the payment of administrative fees of roughly 1% times the volume of sales generated by the PBG membership (*i.e.* number of units sold) times the catalog price of the product.  (Pl's Exhibit 74, pp. 30-50). The agreements also all included performance requirements such that if a PBG failed to meet those benchmarks (which since 2010 was 80% market share for RotaTeq, Hep A pediatric and Hep B pediatric vaccines), the members of that PBG would lose their discounts under the contract.  (Pl's Exhibit 74, pp. 51-52, 202-206, 214-216).

possible with the goal that such "Eligible/Vaccine Clinics" will agree to purchase Merck vaccines in certain quantities and certain therapeutic categories. (See, e.g. Exhibit 1[7] to Def. Memorandum in Support of Renewed Motion to Compel Arbitration, paragraph 2.2).  In return, the PBGs are paid "administrative fees" equal to the percentage of all "Net Sales" of each Merck vaccine purchased by the PBGs' eligible clinics, but those fees are only payable if the PBGs satisfy their second contractual obligation: to achieve the "Merck Market Share" for "each Merck Vaccine in the Vaccine Group."  (Def's Exhibit 1 at paragraph 6.3; Pl's Exhibit 73 [Dep. of William Mark Smith, pp. 70-71; Pl's Exhibit 74 (Dep. of Michele Taylor, pp. 30-52)).  In turn, the individual eligible clinics (i.e., the member physician groups such as the plaintiffs here) receive discounts on the sales prices of the designated Merck vaccines; again, those discounts are provided only if the PBG as a whole has met its Merck Market Share sales benchmark for that Merck vaccine.  And in the case of the two PBGs at issue in this action, after deduction of their operating expenses from the administrative fees received from the pharmaceutical manufacturers with whom

---

[7] Defendant's Exhibit 2 is a virtually identical Agreement between Main Street Vaccines and Merck and unless otherwise noted, the paragraph citations referencing Exhibit 1 apply with equal force to Defendant's Exhibit 2. As reflected in Defendant's Exhibits 3 and 5, these contracts, as amended, were extended at least through December 31, 2019. (See: Def. Exhibits 4 and 6 to Memorandum in Support of Renewed Motion to Compel for contractual amendments; Pl's Exhibit 73, pp. 38-39; Pl's Exhibit 74, pp. 150-151, 158-160).

they held contracts, they would return the remaining funds to their member practices in the form of annual rebates or rewards checks calculated as a percentage of their share of the overall purchases made by the membership.  (Def's Exhibit 1, paragraph 3.1, 3.3, 3.5; Pl's Exhibit 74, pp. 214-216).  For the most part, the terms and conditions, pricing and performance requirements were the same for all physician and customer buying groups.  (Pl's Exhibit 74, pp. 56-58; pp. 206-207, 213).

The individual member physician practice groups had no negotiations with Merck relative to the buying group contracts – instead, Merck presented its template agreement to the PBGs as a first draft and the agreements were subsequently modified slightly to identify the individual PBG involved.  (Pl's Exhibit 72 [Rule 30(b)(6) Dep. of David M. Schwartz, M.D.] pp. 17-18; Pl's Exhibit 73, pp. 161-164, 177-189; Pl's Exhibit 74, pp. 202-207).  And there appears to have been very little, if any, negotiations between the PBGs and Merck. (Pl's Exhibit 69, pp. 93-96; Pl's Exhibit 70, pp. 301-302).  New physician practice groups could be added as members at any time after the PBGs had signed their Agreements with Merck and the PBGs needed to simply add the new member practice group's information to the "Schedule B" which was attached to and referenced in the Merck-PBG

Agreements.[8] (Pl's Exhibit 72, p. 18; Pl's Exhibit 73, pp. 35-36;

Pl's Exhibit 74, pp. 210-212).  A practice could become a member

of a PBG by either contacting and requesting an enrollment form

or simply downloading the form and membership agreement from the

PBG's website, completing it and faxing it back. (Pl's Exhibit

67, pp. 32, 39-40; Pl's Exhibit 73, pp. 52-53).  Although Merck

had to approve an applying practice as an eligible clinic before

that practice could be linked to the Merck contract with the

PBG, Merck itself did not communicate any information about the

terms and conditions of its agreements with the PBGs to the

individual physician practice groups either directly through its

sales people or otherwise, other than to inform them what the

discounted prices would be if they were a PBG member and that

the PBGs had certain performance requirements for designated

Merck products.  (Pl's Exhibits 49, 50; Pl's Exhibit 70 [Dep. of

Kathleen Roman,] pp. 156, 158, 160, 162, 163-166, 290-293; Pl's

---

[8] Specifically, the Agreements further note in paragraph 2.1 that:

> …By submitting a list of Vaccine Clinics to be attached to Schedule B,
> [PBG] hereby acknowledges that it has the authority of the Vaccine
> Clinics to participate in this Agreement.

CCPAPP understood this clause to be a pre-condition with which it needed to
comply in order to participate in the Merck buying contract and that in
providing the list of its member vaccine clinics/physician practices it had
the authority of those members to participate in the agreement.  (See, Dep.
Of Kena Norris, Executive Director of CCPA and CCPAAPP, Pl's Exhibit 69, at
pp. 63-68).  MSV interpreted this language as requiring it to have its member
practices complete an enrollment form indicating that they wished to be a
member of the Merck contract and that they were authorizing MSV to join that
contract.  (Pl's Exhibit 73, pp. 36-38).

Exhibit 71 [Dep. of David M. Schwartz, M.D., pp. 121-122; Pl's Exhibit 73, pp. 207-213; Pl's Exhibit 74, pp. 65-66, 169-170, 172-176, 250-251). Instead, Merck deemed it the responsibility of the PBGs to administer and manage member compliance with the contracts and to communicate the terms and conditions of the agreements that were applicable to the individual members. (Pl's Exhibit 70, pp. 175-176, 226-227, 291-293; Pl's Exhibit 74, pp. 55-59, 222, 249-250). In this regard, Section 4.6 of the Merck/PBG Agreements stated:

> [PBG] will accurately communicate to Eligible Clinics *the terms and conditions of this Agreement identified as being applicable to Eligible Clinics,* and shall inform them that by purchasing Merck Vaccines pursuant to this Agreement, Eligible Clinics agree to the applicable terms and conditions as set forth herein. (emphasis added)

(Def's Exhibits 1 and 2; Pl's Exhibit 73, pp. 40-41; Pl's Exhibit 74, pp. 221-222).

As this clause suggested, not all of the provisions of the Agreements between the PBGs and Merck were intended to apply to the individual member practices. (Pl's Exhibit 69, p. 69; Pl's Exhibit 74, pp. 217-219). For example, within Section 9, which is broadly entitled "TERM & TERMINATION, CONFIDENTIALITY, AUDIT, MISCELLANEOUS" and is the Section of the Agreement containing the Arbitration Clause, several provisions are by Merck's own admission, wholly inapplicable to the member practices. (Pl's

Exhibit 74, pp. 218-221).[9]  As Michele Taylor, Merck's Head of

its Private Sector Customer Marketing & Sales Division,

testified:

> "So it's not super clear.  And we have over time, when we
> come across items that aren't clear, we amend or with the
> next template we add language to make it more clear…
> meaning that the entire contract in general is intended to
> apply to the clinics, except where obviously it doesn't
> make sense; like a clinic can't terminate the PO's contract
> with Merck, so it's obvious it doesn't need additional
> explanation, or there's something that has been unclear.
> And so those are the places that over time if it's been
> raised as an issue, something that was not clear, then we
> would take the opportunity to amend the contract or the
> next time we update the template to add a language to make
> it more clear.  But we haven't gone through and kind of
> tagged each of them in/out, in/out, which I realize, you
> know, makes it more difficult."

(Pl's Exhibit 74, pp. 219, 223-224).

Presumably in an attempt to provide some additional

clarity, Section 4.6 was amended in 2015 and now reads:

> [PBG] shall use best efforts to encourage Eligible Clinics
> to comply with those terms and conditions of this Agreement
> *that are identified as being applicable to Eligible*
> *Clinics*.  [PBG] represents and warrants that it shall
> notify Eligible Clinics in writing of such terms (at least
> once per year during the Term and upon any applicable
> changes to such terms) and shall inform Eligible Clinics
> that by purchasing Merck Vaccines pursuant to this
> Agreement, Eligible Clinics agree *to the terms and*
> *conditions of this Agreement identified as being applicable*
> *to Eligible Clinics,* such as, but not limited to Section
> 2.2 ("Own Use"), Section 3 ("Discounts for Merck
> Vaccines"), Section 5 ("Purchases and Measurements of
> Market Share"), Section 9, Schedule D ("Net Effective

---

[9]   Specifically, Ms. Taylor identified Sections 9.2 and 9.9 as definitely not
being applicable to the member physician practices and she wasn't sure but
thought that maybe Sections 9.7 and 9.14 might also be inapplicable.  (Pl's
Exhibit 74, pp. 218-229).

Prices For Merck Vaccines"), and Schedule F ("Duty to
Warn"). (emphasis added)

(Pl's Exhibit 69, pp. 77-80; Pl's Exhibit 73, pp. 46-47; Def's

Exhibits 4 and 5). On this point, Kena Norris of CCPAPP

testified in her deposition:

Q.  So based on this amendment, does CCPAPP understand that
Section 9 of the contract is applicable to the members who
are – participate in the Merck-CCPAPP contract?
                    …

THE WITNESS:  I don't have an opinion on that.

BY MR. LAZEROW:

Q.  You don't have an opinion as to whether Section 9 is
applicable to such – to the members who are participate
(sic) in the contract?

A.  Well, I mean as it reads, it says "Applicable to
Eligible Clinics, such as, but not limited to," and then if
you look at Section 9, there are portions of Section 9 that
are clearly not applicable to our members.


Q.  Which portions of Section 9 are you thinking of that
are clearly not applicable to your members?

A.  I wouldn't think that our members would be able to
terminate our agreement, so, 9.2 is one of them.

Q.  Are there any others?  Feel free to look at the
sections obviously.

A.  Yes. Thank you. 9.9, I wouldn't expect our members to
notify Merck of any material change to our corporate
structure.  And – and the rest of it, I --- I'm unclear
based on the language whether it would apply or not. That
would require us to – for me to talk to our attorneys and
seek counsel, but those are the two that jump out of
Section 9 for me.

BY MR. LAZEROW:

20

Q.  Let me just make sure I understand what you are saying.
You're saying that you – you do not believe that Section
9.2 and Section 9.9 apply to CCPAPP's members, is that
right?

A.  I mean as it reads.

     …

Q.  Okay.  And without seeking counsel for the rest of the
provisions of 9.9 – Section 9, are you saying you are
unclear as to whether they apply to members?

A.  That's – that's correct.

(Pl's Exhibit 69, pp. 81-84).  Ms. Norris further stated that,

pursuant to Amended Section 4.6 providing that CCPAPP would

notify its member clinics in writing of the terms and conditions

in its agreement with Merck that were applicable to them, it

communicated those which it identified as being applicable to

the clinics, particularly the pricing and discounts to be

received as it believed those would be of interest to them.

(Pl's Exhibit 69, pp. 85-88, 157-159, 225-227, 230).  It did

not, however, provide notice to its members that Section 9.10

(the arbitration clause) was a term of the Merck Agreement which

was applicable to them.  (Pl's Exhibit 69, pp. 88-89, 149-151,

158-159; Pl's Exhibit 70 [Deposition of Kathleen Roman, Merck

Physician Organization Customer Team Lead Account Executive] at

pp. 117-119).

William Smith, the President of MSV, in turn testified that

it was MSV's understanding that the iterations of Section 4.6

21

meant that if a practice was enrolling in the Main Street
program through completion of their Enrollment Form/Membership
Agreement, they were also enrolling into the contract which Main
Street had with Merck and agreeing that they would abide by the
terms and conditions of this contract.  (Pl's Exhibit 73, pp.
40-41, 169-170, 199-203).  According to Smith, Section 4.6 also
meant that MSV should communicate to their members some of the
sections of their contract with Merck such as the pricing and
discounts, compliance metrics and market share requirements.
(Pl's Exhibit 73, pp. 46-48, 207-217, 227-228).  Despite this
belief, the pricing, discounts and purchasing compliance
provisions were the only terms and conditions which MSV relayed
to their member practices – it never did send the members the
specific language or Section 9.10 containing the arbitration
clause or specifically inform its membership that they were
agreeing to arbitrate any disputes which might arise with Merck.
(Pl's Exhibit 73, pp. 240-246, 252-260).

Thus, notwithstanding the dictates of the foregoing Section
4.6, none of the plaintiff member practices ever received any
communications from their respective PBGs about the terms and
conditions of their agreements with Merck with the exception of
email and newsletter communications regarding price changes and
minimum purchasing requirements. (Pl's Exhibit 66, pp. 100, 102-
107, 137-138; Pl's Exhibit 67 [Dep. of Louis M. Giangiulio,

M.D.], pp. 56-57, 59-61, 69-72; Pl's Exhibit 71, pp. 121-122,
124).  Likewise, Merck did not specifically request that the
PBGs share Section 9.10 with their members.  (Pl's Exhibit 70,
pp. 180-183, 206-208, 211-212).

In addition, the Merck/PBG contracts are not readily
provided to the physician practice/vaccine clinic members.
(Pl's Exhibit 66 [Rule 30(b)(6) Dep. of Joshua Evan Dowd, pp.
86-87, 99-101).  While the agreements might be made available
upon request to the PBG from a member, no practice group member
of either CCPAPP or MSV has ever requested a copy of its
contract with Merck.[10]  If one had made that request, CCPAPP
takes the position that it would first have to check with and
obtain permission from its legal counsel before it would release
it to a member because of its belief that the Merck contract is
only between it and Merck, while MSV would provide a copy given
its understanding that the members would also be bound by the
agreement's confidentiality terms.  (Exhibit 69, pp. 53-54, 70-
71, 229-230; Exhibit 73, pp. 41-42, 195-203).  In this case,
however, none of the plaintiff member practices ever saw or
asked to see their PBG's agreement with Merck.  (Pl's Exhibit

---

[10] Kena Norris began working for CCPAPP in 2014 and could not testify about
anything that may have occurred prior to assuming her position as its
Executive Director.  (Pl's Exhibit 69, pp. 45-46, 71).  William Smith began
working for MSV in 2016. (Pl's Exhibit 73, pp. 26-27).

66, pp. 205-208; Pl's Exhibit 71, pp. 71-72, 126-130; Pl's Exhibit 73, 215-217).

Turning next to the membership agreements/enrollment applications submitted by the individual physician groups to the PBGs in which they wished to enroll, we note that the language in paragraph 1 of the Group Purchasing Participation Agreement signed by CCPAPP member practices reads as follows in relevant part:

> (a)   By executing and submitting this Agreement to GPO, Provider authorizes GPO to act as its non-exclusive agent to arrange for the purchase of goods and services as set forth herein, and agrees to comply with and be bound by the terms and conditions of this Agreement.

(Exhibit 18 to Defendant's Renewed Motion to Compel Arbitration and Stay Proceedings; Pl's Exhibit 69, pp. 271-276).  In the case of CCPAPP, its member practices were typically annually reminded that they were "required to complete the Group Participation Agreement in order to maintain membership in our [PBG] organization" in the transmittal letters enclosing the year-end distribution of the portion of administrative fees earned by the PBG from the sales attributable to each member practice.[11]  The CCPAPP letters generally included the following language:

---

[11] Again, it was the practice of the PBGs to annually provide rebate checks to their member practices calculated as a percent of each practice's purchase volume over total member purchases multiplied by the amount in the Members' Distribution Pool.  (Pl's Exhibit 69 and Def's Exhibit 7 [Dep. of Kena

> Lastly, as previously communicated, all current member practices of CPPAPP are required to complete CCPAPP's *Group Purchasing Participation Agreement* in order to maintain membership in our organization.  This agreement authorizes CCPAPP to act as your practice's agent for the purchase of goods and services, including vaccines and medical supplies…. (italics in original)

(Def's Exhibit 19; Pl's Exhibit 71, pp. 130-132).  Kena Norris testified that CCPAPP included paragraph 1(a) in its Group Purchasing Participation Agreement to provide notice and to ensure that its members understood that they were authorizing CCPAPP to act as their agents in negotiating for products and goods and services for their benefit, that CCPAPP was acting on their behalf to arrange for contracts for goods and services, and that they are bound by the terms of their agreement.  (Def's Exhibit 7 and Pl's Exhibit 69, pp. 105-107, 110-111).  That having been said, however, CCPAPP did not consider itself to have authority to bind its members to any terms that were not disclosed to them, nor did the Plaintiff member practices authorize CCPA to bind them to any terms and conditions that they had not seen or that they had not specifically opted into.  (Pl's Exhibit 69, pp. 272-273; Pl's Exhibit 71 [Dep. of David Schwartz, M.D., pp. 70-71).  Rather, the member practices generally understood that under their memberships and in exchange for, *inter alia*, membership fees and vaccine-bundling

Norris] at p. 24; Def's Exhibit 19). Those rebates are paid after the PBGs pay their expenses and operating costs.  (Pl's Exhibit 69 and Def's Exhibit 7, pp. 24-26).

loyalty requirements, the PBGs would go out and contract with
vendors for vaccines and other products at discounted prices,
and that the PBGs would present to the members the terms and
conditions for those discounted prices at which time the
practices would have the choice of opting in or out.  (Pl's
Exhibit 71, pp. 66-72).

     And under the Vaccine Contracting & Compliance forms which
each member provider was required to execute, the member was
obligated to opt-in to one of several options regarding the
purchase of vaccines: to participate in the Merck vaccine
contract only, the Sanofi Pasteur contract only, the Merck and
the Sanofi contracts or neither and thereby choose to
participate in a different contract with a different
pharmaceutical manufacturer offered by the Group Purchasing
Organization/PBG such as GlaxoSmithKline. (Pl's Exhibit 71, pp.
113-118).  CCPAPP utilized this form to confirm that it had the
authority of its member practices to include them in the
"Schedule B" annexed to the contract with Merck. (Def's Exhibit
7 and Pl's Exhibit 69, pp. 152-156).  For example, by opting to
participate in the Merck and Sanofi Pasteur contracts, a
CCPAPPLP member practice agreed that:

> My practice fully supports CCPA Purchasing Partners' **Merck
> and Sanofi Pasteur** contracts by agreeing to purchase
> Merck's Hepatitis A (Vaqta), Hepatitis B (Recombivax HB),
> MMR (M-M-R II), Varicella (Varivax), HPV (Gardasil/Gardasil
> 9), Rotavirus (RotaTeq), and Pneumococcal (Pneumovax 23)

vaccine products as needed.  My practice also agrees to
purchase Sanofi Pasteur's Polio, Pertussis, HIB products
(Pentacel, IPOL, DAPTACEL and Quadracel), Meningococcal
(Menactra) and Tdap (Adacel) vaccine products as needed.
By selecting this option, my practice agrees **not** to
purchase Merck's Pedvax HIB, GlaxoSmithKline's Infanrix,
Havrix, Engerix-B, Kinrix, Twinrix, Hiberix, Cervarix,
Rotarix and Pediarix products, Novartis' Menveo product,
and/or any other vaccine product that competes with the
Merck and Sanofi products noted above.  It is understood
that failure to comply with these compliance terms may
result in price increases, loss of administrative awards,
and termination of my practice from CCPAPP's Merck and/or
Sanofi Pasteur contracts.
                    (emphasis in original)

Despite never having been told that the terms and conditions in

the documents it had signed were the only terms and conditions

of the Merck-CCPAPP Agreement, by checking the box on the

participation form to opt into the Merck contract, Plaintiff

Schwartz Pediatrics for one did not believe that by so doing, it

was opting in to *any* terms and conditions other than those that

had been communicated by its PBG, CCAPP, in the documents it had

sent or made available to its membership via its website.[12]

(Pl's Exhibit 72, pp. 18-23).

    Although its operations differ slightly from CCPAPP's, Main

Street Vaccines also sends out an annual letter to its

---

[12] Unlike the Agreements which it enters into with PBGs, Merck does not
include an arbitration clause in the terms and conditions relative to vaccine
sales on its website.  Thus, if a practice was purchasing vaccines directly
from the website without a purchasing organization membership, those
purchases are not subject to an arbitration clause.  What's more, while the
contracts which it enters into with distributors and wholesalers contain
arbitration clauses, Merck does not require physicians who purchase through
those mediums to arbitrate any disputes which they may have with Merck.
(Pl's Exhibit 74, pp. 231-233).

membership with their annual rebate/rewards checks in which it
encloses a copy of its most recent Terms and Conditions as a
reminder.  As of year-end 2019, the Terms and Conditions
enclosed and sent to MSV members stated as follows in pertinent
part:

**DESCRIPTION OF SERVICE**

Group purchasing programs will be established and
communicated to NDC MSV, Inc. Members allowing purchases
directly from third-party vendors at prices negotiated by
NDC MSV, Inc. (each a "Program").  Use of each Program is
voluntary by Member.

**AUTHORITY**

Member hereby authorizes and designates NDC MSV, Inc. to
act as a purchasing agent for Member to enter into
contracts with third-party vendors to furnish goods or
services to Member.  Member authorizes NDC MSV, Inc. [to]
act as its agent to negotiate and enter into agreements
with vendors in order to make agreements available to
Member.  Member authorizes NDC MSV, Inc. [to] act as its
agent to negotiate and enter into affiliation agreements
with other group purchasing organizations ("Affiliate
GPOs") and to enroll Member in Affiliate GPOs in order to
make their agreements available to Member.  NDC MSV, Inc.'s
agency under this agreement is limited to the purposes of
(i) negotiating, entering into and managing Program
agreements with third-party vendors and Affiliate GPOs; and
(ii) collecting and retaining administrative fees that are
paid under the third-party vendor agreements.

…

**DISAGREEMENT WITH VENDOR**

If any dispute pertaining to products or services offered
by or purchased from any third-party vendor arises between
Member and a third-party vendor, then Member must work
directly with the applicable third-party vendor to resolve
the dispute, including but not limited to, disputes

involving invoices, payments, warranty, product returns, claims, product defects, sufficiency of service, etc.

…

**TERMINATION/CANCELLATION**

Unless otherwise stipulated, this Agreement will renew annually on July 1.  It is AGREED that either party may terminate this Agreement at any time, with or without cause.  Member will not be entitled to receive any benefits accrued after the most recent renewal of Member's Agreement.

…

**ACCESS TO INFORMATION**

Member grants NDC MSV, Inc. access to individual and summary sales data provided by vendors, including but not limited to, Sanofi Pasteur and/or Merck, as applicable, to ensure participation compliance.

(Exhibit 26 to Def's Renewed Motion to Compel Arbitration and

Stay Proceedings; Pl's Exhibit 73, pp. 85-92). Under this, MSV

acts as limited agent for its members to enter into third-party

vendor contracts so that its members can receive the benefits of

discounted pricing and year-end rebate checks through its

rewards program.  (Pl's Exhibit 73, pp. 91-92).

The most recent, 2016 version of the MSV/Merck Member

Agreement which must be executed "in order to participate in the

MAIN STREET Vaccine Physician Buying Group ("PBG") Agreement

with MERCK VACCINES ("MRK") further provides in relevant part:

CONDITIONS OF PARTICIPATION

Neither MEMBER nor individual MEMBER PRACTICES ("PRACTICES") will prefer or utilize either directly or indirectly, vaccines, any active component or antigen of which competes with a contracted MRK product except for explicit reasons of medical necessity or declared product unavailability. Specifically, the PBG, MEMBER PRACTICE will maintain a vaccine market share of no less than 90% for each of RECOMBIVAX HB, PNEUMOVAX 23, RotaTeq, Gardasil, ZOSTAVAX and VAQTA.

In consideration of this participation, MRK will provide MEMBER special contract pricing plus on-invoice discounts of:

    2% on purchases of PNEUMOVAX 23 and ZOSTAVAX
    5% on purchases of M-M-R II, VARIVAX and PROQUAD
    6% on purchases of Gardasil/Gardasil 9
    8% on purchases of RotaTeq

        …

<u>TERM AND RENEWAL:</u>

PBG Agreements run from July 1 of each year through June 30 of the following year. Individual MEMBER and PRACTICES contract(s) will run from the initial date they are linked to the Agreement by MRK, through June 30 of the current contract year. Unless otherwise stated, said contract(s) will automatically renew on July 1 of consecutive years thereafter.

<u>COMPLIANCE/TERMINATION:</u>

MEMBERS and PRACTICES are required to maintain contract compliance and are monitored quarterly. At the sole discretion of MAIN STREET a non-compliant MEMBER or PRACTICE may be declared ineligible for any and all accrued benefits and may be removed from the contract without further notification. MEMBER may withdraw at any time on (30) thirty days written notice with loss of accrued benefits to that date.

The undersigned has reviewed and understands this agreement, had opportunity to question its terms, and chooses to participate in it. *In so doing, he/she accepts the conditions and terms offered in the MAIN STREET/MRK contract and MAIN Street Rewards program and warrants that he/she has the authority to commit and bind his/her*

> *practice and all its current and future*
> *physicians/practitioners to them.*
>                  (emphasis/italics added)

(Exhibit 23 to Def's Renewed Motion to Compel Arbitration;  Pl's

Exhibit 73, pp. 53-55).

Despite the references to the Main Street/Merck contract in

the foregoing documents, which were mailed to all MSV members

with the rewards checks, it was the understanding of the

principals in both Sugartown and Margiotti & Kroll Pediatrics

that the only terms and conditions applicable to them were those

contained in their enrollment/membership agreements.  (Pl's

Exhibit 67, pp. 28-37; Pl's Exhibit 73, pp. 96-97).  No one from

Main Street Vaccines or Merck ever informed them that they were

bound by any other terms and conditions in the agreements

between MSV and Merck, no mention was made of an arbitration

clause and they did not think to inquire into the matter.  (Pl's

Exhibit 66, 104-107, 200-209; Pl's Exhibit 67, pp. 40, 47-52,

56-57, 63-65, 118-121).  Indeed, it was the belief of both of

these plaintiffs that so long as they and the rest of the

members of the MSV PBG satisfied the vaccine purchasing

benchmarks articulated in their membership agreements, they

would receive the discounted pricing and year-end rebate/rewards

checks.  (Exhibit 66, pp. 125-126, 152-162; Pl's Exhibit 67, pp.

117-118).

Likewise, MSV acknowledged that despite its understanding
that its members are "a part of" its contract with Merck, it has
never sent any documents or otherwise provided *any* notification
to its membership informing it that there are terms and
conditions that apply to them beyond those listed in their
enrollment forms or that the Merck contract included an
arbitration clause.  Indeed, MSV never provided any information
whatsoever about a duty to arbitrate disputes.  (Pl's Exhibit
73, pp. 114-123, 127-130, 134-140).  Rather, MSV has limited its
communications to its members to providing them specific
information about the pricing, discounts, and the benefits
available, specifically the rewards program and to informing
them that there is a contract between MSV and Merck to which
they are a part.  (Pl's Exhibit 73, pp. 145-149, 243-245).

Viewing these facts in the light most favorable to the
Defendant, we simply cannot find that Merck has sustained its
burden of proving that the member practices had either the
requisite control over their PBGs' negotiation and entry into
their agreements with Merck or that the PBGs had the authority
of their member practices to enter into the arbitration
clauses/agreements to arbitrate this dispute.  To be sure, it
remains far from clear whether the arbitration provisions were
even intended to apply to the member practices.  What *is* clear,
however, is that the practices were given no notice of the

existence of the arbitration provisions in the PBG-Merck
contracts. Rather, it appears that in executing their membership
agreements/enrollment forms, the practices were *only* authorizing
the PBGs to negotiate discounted pricing and other ancillary
benefits with third party vendors including Merck and that it
was their understanding that in exchange for this authorization
they would purchase Merck vaccines in the quantities required.

This is in keeping with the Merck Agreement's specific
requirement that the PBGs only communicate those terms and
conditions of their Merck Agreements *that are identified as
being applicable to Eligible Clinics*.  As both of the Rule
30(b)(6) witnesses for MSV and CCPAPP testified, neither PBG
communicated any information about the arbitration clause to
their memberships, focusing the bulk of their communications on
the available discounts, rebates/rewards programs and purchasing
requirements needed to obtain both.  Neither did Merck
specifically direct the PBGs to communicate that the arbitration
clause was one of the terms and conditions to which they would
be bound.  Consequently, we are constrained to conclude that the
member practices' granted only very limited authority to their
PBGs to enter into those terms and conditions of the Merck
contracts which had been communicated to them, *to wit*, to
negotiate discounted pricing in exchange for the physicians'
agreement to purchase vaccines in the quantities designated.

Thus, the PBGs did not have the necessary authority to bind their member practices to the arbitration provision and Plaintiffs shall not be held liable to arbitrate this matter under an agency theory.[13]

   B.   *Estoppel*

   Under Third Circuit caselaw, "[a] person may also be equitably estopped from challenging an agreement that includes an arbitration clause when that person embraces the agreement and directly benefits from it." Bouriez, 369 F.3d at 295 (citing E.I. DuPont, 269 F.3d at 199-200).  "A non-signatory can 'embrace' a contract in two ways: (1) by knowingly seeking and obtaining direct benefits from that contract; or (2) by seeking to enforce terms of that contract or asserting claims based on the contract's other provisions." Griswold, 762 F.3d at 272 (quoting Noble Drilling Services, Inc. v. Certex USA, Inc., 620 F.3d 469, 473 (5th Cir. 2010) and Haskins v. First Am. Title Ins. Co., 866 F. Supp. 2d 343, 350 (D.N.J. 2012)).[14]

---

[13] Finally, we again note that "authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal." Consolidated Rail Corp. v. ACE Property & Casualty Insurance Co., supra.  Insofar as the party seeking to invoke the authority by estoppel doctrine here is Merck - the drafter of the arbitration clause at issue and not another or different "third party," and given that Merck itself made no efforts to communicate the existence of the arbitration clause to its "eligible clinics" or to ensure that the PBGs did so, we find that this theory has no application in this case.

[14] In its October, 2019 Opinion remanding this matter to this Court, the Third Circuit decreed that "because this case involves a signatory attempting to bind a non-signatory, the correct test to be applied is whether 'the non-signatory knowingly exploits the agreement containing the arbitration clause despite never having signed the agreement.'"  789 Fed. Appx. 934, 2019 U.S.

34

Defendant asserts that Plaintiffs are properly equitably estopped from avoiding the arbitration clause because they knowingly exploited the Merck/PBG agreements to reap the benefits provided under those contracts.  We disagree.

While it is true that the Plaintiffs did receive discounted pricing on their vaccine purchases, we cannot find that in so doing, they "knowingly exploited" the agreements between their respective PBGs and Merck.  For one, while the Plaintiffs were made aware that the buying groups in which they enrolled had agreements with Merck, the record does not support a finding that Plaintiffs here are or were knowingly seeking and obtaining direct benefits from that agreement, nor are they seeking to enforce the terms of that contract or asserting claims based on the contract's other provisions by this lawsuit.[15]

Instead, it appears that from the Plaintiffs' perspectives, they were entering into symbiotic agreements with their PBGs to participate in their buying programs with Merck, thereby ensuring that the PBGs could meet their sales benchmarks and receive payment of their administrative fees.  These fees paid for the PBGs' operating expenses and if the benchmarks were not

---

App. LEXIS 32286 at *8 (3d Cir. Oct. 28, 2019)(quoting E.I. Dupont de Nemours & Co. v. Rhone Poulenec, 269 F.3d 187, 199 (3d Cir. 2001)).  Accordingly, it is this test which we now endeavor to apply.

[15] Instead, as noted in the opening paragraphs of this Memorandum, Plaintiffs are advancing primarily anti-trust claims in their Amended Complaint.

met, the fees were not paid.  It is also clear that these buying programs were for Merck's benefit in that Merck was receiving a guaranteed level of vaccine sales, which sales Plaintiffs allege, have been in such large quantities that Merck has been able to effectively dominate the market against its competitors in certain therapeutic categories.  Again, Plaintiffs only receive discounted pricing on their vaccine purchases from Merck if their PBG as a whole has met its Merck Market Share sales benchmark for that Merck vaccine.  Indeed under this scenario, we find that if anything, it is Merck that is exploiting the contract which it has with the PBGs -- not the Plaintiffs. Accordingly, we do not find that Plaintiffs should be held to be bound by the arbitration provision or compelled to arbitrate this matter under the equitable estoppel theory either.

### Conclusion

For all of the foregoing reasons, we decline to require this matter to be submitted to arbitration.  Defendant's Motion to Compel Arbitration is therefore denied and Plaintiffs' Motion for Summary Judgment on the issue or arbitrability is granted.

An order follows.